**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 07a0516n.06
Filed: July 19, 2007

**Nos. 06-6071, 06-6138**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| JAMES W. BORG, Executor of the Estate of Mary Borg, and JAMES W. BORG, individually, | ) | |
| | ) | |
| | ) | ON APPEAL FROM THE |
| Plaintiffs-Appellants, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| v. | ) | DISTRICT OF TENNESSEE |
| | ) | |
| CHASE MANHATTAN BANK USA, N.A.; UNION PLANTERS BANK, N.A.; HOME INSTEAD SENIOR CARE, INC., | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants-Appellees. | ) | |
| _____ | ) | |

BEFORE: RYAN and GRIFFIN, Circuit Judges; and HOOD, District Judge.[*]

GRIFFIN, Circuit Judge.

Plaintiffs James W. Borg, as the executor of the estate of Mary Borg, and James W. Borg, individually, appeal the district court's entry of summary judgment in favor of defendants Chase Manhattan Bank USA, N.A. ("Chase"), Union Planters Bank, N.A. ("Union Planters"), and Home Instead Senior Care, Inc. ("Home Instead"). Plaintiffs argue that the district court erred in concluding that no genuine issues of material fact exist, that plaintiffs' claims under the Truth in Lending Act ("TILA" or "the Act") are barred by the statute of limitations, that TENN. CODE ANN.

---

[*]The Honorable Joseph M. Hood, Chief United States District Judge for the Eastern District of Kentucky, sitting by designation.

§ 47-3-420 precludes plaintiffs' claim for conversion against Chase, that TENN. CODE ANN. § 47-4-406 bars plaintiffs' claims of breach of contract and negligence against Union Planters, and that Home Instead and Chase are entitled to summary judgment on plaintiffs' claims of negligence. Plaintiffs argue further that the district court abused its discretion in excluding their proposed expert witness. For the reasons set forth below, we affirm the district court's entry of summary judgment in favor of defendants.

I.

Mary Borg was a long-time resident of Memphis, Tennessee.[1] Following her husband's death in 1981, her adult son James moved back in to Mary's home. In approximately 1989 or 1990, James and Mary opened a joint checking account with defendant Union Planters. Although it was opened as a joint account, all of the funds held in the account were the property of Mary, derived from her Social Security income. Union Planters mailed copies of the account's statements and cancelled checks to the Borg residence on a monthly basis.

In 2000, Mary Borg's stepdaughter employed defendant Home Instead to provide a caregiver in the Borg house to stay with Mary Borg during business hours, usually for five days per week. Eventually, Felicia Jones Davis became the sole Home Instead employee to attend to Mary Borg. Davis was a licensed nurse's aid and had been hired by Home Instead in October 2000. Darrell Doane, the owner of Home Instead, provided an affidavit which states that at the time of her hire,

---

[1]Mary Borg died on March 4, 2006. James Borg, as executor of Mary Borg's estate, was substituted as the plaintiff on June 6, 2006.

a criminal history background check performed on Davis revealed that she had no criminal history. Doane testified further that all personal and employment references provided by Davis had been complimentary. According to Doane, "Home Instead never received a complaint from anyone about Ms. Davis' job performance during her time with the company."

In early 2002, Chase mailed Mary Borg a credit card application to her residence in Memphis. The application invited Mrs. Borg to apply for the card over the telephone and provided a telephone number and a code number that the card applicant was required to furnish during processing of the application. Plaintiffs allege that Davis intercepted the application and applied for the credit account under the guise of Mary Borg. On April 11, someone purporting to be Mary Borg called the number identified on the credit card application and provided the code number that corresponded with the mailing sent to Mrs. Borg. Future Call, a third-party vendor, processed "Mary Borg's" application. According to Karen Trimmer, Chase's Vice President of Regional Investigations, Chase requires Future Call to "verify that the address to which the application was sent remained the address to which the card was sent" and have "every telephone applicant provide the code contained in the application as well as the correct social security number and date of birth of the person to whom the application was sent." Chase issued a single card with a credit limit of $7,000 and mailed it to the Borg residence in Memphis. Between May 22, 2002, and May 27, 2003, the Chase credit card incurred charges. Each payment received by Chase was written on a Union Planters checking account maintained by Mary Borg and James Borg, and each check listed the Borg residence as the address on the account and bore the names of James Borg and Mary Borg.

In late May and early June of 2003, James and Mary Borg discovered the existence of the credit card, the unauthorized charges, and the forged checks drawn from the joint checking account. James Borg noticed that, although he had continued to receive statements from Union Planters on his separate checking accounts, his mother had not seen any statements pertaining to the joint checking account. James Borg contacted his local Union Planters branch about his concerns and discovered that $3,000 had recently been withdrawn from an ATM without his or his mother's knowledge. The Borgs later discovered that approximately $86,000 had been charged to the Chase credit account and had been paid for by funds from the joint checking account. After learning that several transactions had occurred in and around Felicia Jones Davis's hometown, James Borg informed Davis that she was no longer welcome to work at the Borg residence.

Mary Borg submitted an Affidavit of Forgery to Union Planters on June 16, 2003, listing thirty-five checks identified as forgeries.[2] In sum, the forged checks totaled $86,482.63, of which $82,800 had been made payable to Chase. One week later, on June 23, Mary Borg executed a fraud alert affidavit for Chase, stating that she had notified Chase of unauthorized usage of the credit card on May 27, 2003. The affidavit lists over 150 unauthorized transactions, beginning on November 1, 2002, and concluding on May 27, 2003; nearly every unauthorized transaction was an ATM cash

---

[2]The first check was dated April 18, 2002 (#4535) and was made payable to cash. This check was identified on the joint checking account's statement for the period beginning April 2, 2002, and ending May 2, 2002. The last check was dated May 18, 2003 (#9909) and was made payable to Chase.

withdrawal.[3] After receiving notice of the fraud, Chase closed the account, wrote off the outstanding

balance of $2,127.58 and "contacted the relevant credit bureaus to ensure that Mrs. Borg did not

have any negative credit reports as a result of Ms. Davis's fraud."

Mary Borg and James Borg filed a complaint against defendants in Tennessee state court on

June 24, 2004. The complaint, twice amended, alleges that Chase's negligence in opening and

maintaining the credit card account was the proximate cause of the financial harm to plaintiffs, that

the $82,800 paid to Chase was stolen property that Chase converted to its own use, and that Chase

violated the Truth in Lending Act, 15 U.S.C. §§ 1601 et seq. Plaintiffs contend further that Union

Planters breached its contract with them and acted negligently by honoring the forged checks.

Plaintiffs also allege that Home Instead is vicariously liable for the acts of its employee Davis, that

Home Instead acted negligently in hiring and supervising Davis and that this negligence was the

proximate cause of plaintiffs' injuries.[4]

Chase removed the case to federal court in October 2004. In December 2004, the district

court entered a scheduling order, setting a discovery deadline date of September 16, 2005, and

requiring plaintiffs to provide their FED. R. CIV. P. 26 expert disclosures by June 15, 2005. On

September 19, 2005, the district court granted the parties' joint motion to amend the scheduling

order, pushing back the deadlines for completing fact discovery and deposing expert witnesses until

---

[3]Although the affidavit lists unauthorized usage of the card beginning on November 1, 2002, the card incurred charges beginning on May 22, 2002.

[4]Borg also named Felicia Jones Davis as a defendant. The district court entered an order of default judgment against Davis on February 1, 2006.

October 15, 2005.  The deadline for filing dispositive motions was extended until November 15,

2005.  No other deadlines were amended.

Defendants moved for summary judgment on November 15, 2005.  The district court granted

each defendant's motion in an order dated July 21, 2006.  This timely appeal followed.[5]

## II.

We review de novo the district court's entry of summary judgment in favor of defendants.

*Brainard v. Am. Skandia Life Assur. Corp.*, 432 F.3d 655, 660 (6th Cir. 2005).  Summary judgment

is proper when there are no genuine issues of material fact in dispute and the moving party is entitled

to judgment as a matter of law.  FED. R. CIV. P. 56(c).  A genuine issue for trial exists only when

there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  "[T]o the extent that there is disagreement about the

facts . . . we must review the evidence in the light most favorable to the Plaintiffs, taking all

inferences in their favor." *Champion v. Outlook Nashville*, 380 F.3d 893, 900 (6th Cir. 2004).

We review the district court's imposition of Rule 37 sanctions for an abuse of discretion.

*Sommer v. Davis*, 317 F.3d 686, 692 (6th Cir. 2003).

## III.

---

[5]Plaintiffs filed two separate appeals from the district court's July 21, 2006, order.  The appeals are identical in substance – the second appears to differ from the first only in that it clarifies that no appeal is taken with regard to defendant Davis – and the parties have not discussed in their briefs why two separate appeals were filed.

Borg first challenges the district court's statement that the "facts of this case are largely undisputed," and argues that genuine issues of material fact exist that preclude summary judgment. Borg identifies eight facts that he contends are disputed. We disagree.

Plaintiffs take exception to the district court's conclusion that Home Instead did a thorough background check on Davis and received no complaints about her prior behavior. Plaintiffs point to James Borg's testimony, in which he says that he informed Home Instead of Davis's alleged fraudulent behavior after discovering the forged checks. This testimony is irrelevant to whether Home Instead received any complaints about Davis before she started working at the Borg residence and does not contradict the district court's conclusion.

Borg also takes umbrage with the district court's citation to the Doane affidavit, which the court relied upon to state that "Home Instead also conducted an abuse registry check and found no complaints. A private company performed a criminal history background check on Davis and found no criminal record." Plaintiffs argue that Doane's affidavit should not have been credited by the district court because the affidavit also contains the following statement by Doane: "Home Instead did not have any knowledge of the criminal acts that Felicia Jones Davis allegedly committed against Mary Borg. In fact, Home Instead still has no knowledge and has never been interviewed by any law enforcement authorities concerning the alleged thefts." According to plaintiffs, this conflicts with Doane's deposition testimony in which he claims to have informed Home Instead of Davis's alleged thefts. Plaintiffs' argument fails for two reasons. First, these statements do not contradict each other; plaintiffs have not pointed to any evidence of criminal investigation or Home Instead's direct

knowledge of Davis's alleged thefts. Moreover, even if these statements were read to conflict with each other, they are separate from Doane's statements concerning Home Instead's background checks. In order to disregard Doane's affidavit concerning the background checks, as plaintiffs would have us do, we would be required to make an impermissible determination about Doane's credibility. *See Reeves v. Swift Transp. Co.*, 446 F.3d 637, 640 (6th Cir. 2006) ("When reviewing a district court's grant of summary judgment, the appellate court may not determine the credibility of witnesses or weigh evidence."). The district court properly considered Doane's affidavit concerning Home Instead's background checks on Davis, and James Borg's testimony did not create a genuine issue of material fact on this issue.

Next, plaintiffs argue that the district court erred in crediting a statement, made in the affidavit of Karen Trimmer, that Chase requires Future Call to "verify that the address to which the application was sent remained the address to which the card was sent" and have "every telephone applicant provide the code contained in the application as well as the correct social security number and date of birth of the person to whom the application was sent." Plaintiffs argue that because Chase, or Trimmer herself, did not process the credit card application phone call, Trimmer's statement is hearsay. Trimmer's statement, however, is not hearsay, as it merely describes the policies and requirements that Chase has set for its third-party vendors to follow when processing credit card applications. Because Trimmer's affidavit concerns no statements made by any person other than Trimmer, and was based on personal knowledge, the district court properly considered the entire affidavit.

Borg disputes the district court's reliance on the following fact, as described by plaintiffs: "That Chase card issued in name of Mary Borg incurred charges from May 22, 2002 until May 27, 2003. Each payment received in the form of check on Plaintiffs' joint checking account with Union Planters." [sic]. Plaintiffs' concern with this statement is difficult to understand; plaintiffs argue that "this evidence demonstrates such a strange pattern of spending and payment that Chase and Union Planters' failure to conduct any type of investigation would constitute negligence per se." Plaintiffs' argument, then, goes only to the legal conclusions to draw from this fact; plaintiffs concede that this "could be considered an accurate statement of fact. . . ." In any event, the district court's description of the forged checks is clearly and unambiguously supported by the record.

Plaintiffs also argue that the court erred in stating that in "late May or early June 2003, Plaintiffs discovered the existence of the credit card, the unauthorized charges, and the forged checks on Plaintiffs' joint checking account. Plaintiffs subsequently notified Union Planters and Chase of the fraudulent activity." Plaintiffs contend that "the official notification did not come until June 23, 2003 when Mary Borg executed the affirmation of fraudulent use." Thus, plaintiffs argue, there is a genuine issue of material fact as to the date of Chase's knowledge of the fraud for purposes of construing the Act's statute of limitations. We disagree. The date on which Chase received notice of the fraudulent activity is irrelevant for computing the statute of limitations; rather, when equitable tolling is applied, "the one year period will begin to run when the borrower discovers or had reasonable opportunity to discover the fraud involving the complained of TILA violation." *Jones v. TransOhio Sav. Ass'n,* 747 F.2d 1037, 1041 (6th Cir. 1984). Thus, to the extent that there is any

debate between the parties as to when Chase received notice of the fraud, the fact at issue is not material.

Next, Borg disputes the district court's statement that after "Chase was notified of the fraudulent activity, it closed the account and did not seek any payment from Plaintiffs to cover the outstanding balance of $2,127.58." Plaintiffs point to a bill sent to the Borg residence that originally sought payment for the outstanding balance on the credit card account and argue that this creates a genuine issue of material fact. Again, we disagree. Regardless of whether Chase sent a bill seeking payment for the outstanding balance on the account, it is undisputed that ultimately Chase charged off the remaining balance as a loss. Thus, the district court's statement was factually correct.

Finally, plaintiffs contest the district court's assertion that "Union Planters mailed copies of the joint checking account statements and cancelled checks to Plaintiffs' residence each month." Plaintiffs claim that "the Plaintiff never admitted that the statements were sent. The Plaintiff admitted that the statements should have been sent. The fact that Borg did not receive card or bank statements is material and creates a genuine issue for trial." The district court's assertion, however, is based on James Borg's own testimony.

> Q:   Your recollection is you received your individual account at or about the same time each month as the statement for the joint account came in?
>
> A:   Everything came in together.
>
> Q:   Do you remember when you stopped seeing statements for the joint account?
>
> A:   Not the exact time, but it was prior to – right around Bill McGraw's death.
>
> Q:   That was in December?

A:     December of '02.

. . .

Q:     Do you have any reason to believe that Union Planters stopped mailing the statements to you at any point in time?

A:     Why would they do that?  It was an active account.

Q:     Pardon?

A:     Why would they do that?  It was an active account with the bank.

Q:     I'm asking if you have any evidence to suggest that the bank did not mail the statements?

A:     No, I'm sure they did.

Q:     Your belief is that Ms. Davis intercepted the statements that were mailed?

A:     Yes, sir.

Moreover, plaintiffs' own briefs on appeal proceed on this theory. ("The Plaintiff's bank statements were intercepted by the party committing the fraud.") Thus, there is no genuine issue of material fact regarding whether Union Planters mailed plaintiffs the bank statements for the joint checking account.

IV.

A.

Plaintiffs next challenge the district court's conclusion that his TILA claims are barred by the Act's statute of limitations.  The Act provides that "[a]ny action under this section may be brought in any United States district court, or in any other court of competent jurisdiction, within one

year from the date of the occurrence of the violation." 15 U.S.C. § 1640(e). The district court, citing

our decision in *TransOhio Sav. Ass'n*, 747 F.2d at 1043, found that § 1640(e) is subject to equitable

tolling, and held that the one-year limitations period "runs from the date on which the borrower

discovers or had reasonable opportunity to discover the fraud involving the complained of TILA

violation." The court held that the Borgs first alerted Chase to the fraud on May 27, 2003, and that

plaintiffs' complaint, filed June 24, 2004, was filed more than one year after the Borgs discovered

the fraud and, accordingly, was time-barred by the statute of limitations.

Borg asserts that Chase has violated two provisions of the TILA, §§ 1642 and 1643. Section

1642 provides that "[n]o credit card shall be issued except in response to a request or application

therefor. This prohibition does not apply to the issuance of a credit card in renewal of, or in

substitution for, an accepted credit card." 15 U.S.C. § 1642. Section 1643 limits the cardholder's

liability for the unauthorized use of the credit card to $50. 15 U.S.C. § 1643(a); *see also Am.*

*Express Co. v. Koerner*, 452 U.S. 233, 240 n.5 (1981). Both § 1642 and § 1643 are subject to the

Act's one-year statute of limitations. *See Draiman v. American Express Travel Related Servs. Co.*,

892 F. Supp. 1096, 1099 (N.D. Ill. 1995); *see also One Beacon Ins. Co. v. Null*, No. 04-621, 2004

U.S. Dist. LEXIS 13513, at *5 (E.D. Pa. July 20, 2004) (unpublished) (holding that, "[b]y its very

terms, § 1640 applies to 'any requirement imposed under this part'" including § 1643).

Plaintiffs argue with regard to their § 1642 claim that because the "card was still issued and

Chase sent out statements and sought payments until July 27, 2003," the § 1642 violation last

occurred on July 27, 2003, and the statute of limitations did not expire until July 27, 2004. We

disagree. Section 1642 prohibits the issuance of an unrequested card. Under Borg's reading of § 1642, the credit card would have been "issued" during the entire duration of time that the card was active. "Issue," however, means "the act of sending out or putting forth; promulgation . . . ." WEBSTER'S UNABRIDGED DICTIONARY 1015 (2d ed. 2001). In this setting, "issue" has a more discrete meaning: it refers to the date in April 2002 on which Mary Borg's credit card was mailed to the Borg residence. This date is more than two years prior to the date plaintiffs filed the present complaint, and the district court properly concluded that the statute of limitations bars plaintiffs' § 1642 claim.

Moreover, the district court concluded correctly that plaintiffs' § 1642 claim is not saved by equitable tolling. With regard to violations of the TILA, we have held "that the statute of limitations for actions brought under 15 U.S.C. § 1640(e) is subject to equitable tolling in appropriate circumstances, and that for application of the doctrine of fraudulent concealment, the limitations period runs from the date on which the borrower discovers or had reasonable opportunity to discover the fraud involving the complained of TILA violation." *TransOhio Sav. Ass'n*, 747 F.2d at 1043. In her affidavit submitted to Chase, Mary Borg stated that on May 27, 2003, she reported the unauthorized use of the card to Chase. Thus, Borg admittedly discovered the fraud no later than May 27, 2003, and the district court correctly followed *TransOhio Sav. Ass'n* and held that the statute of limitations began running by that date.

Plaintiffs' § 1643 claim is also time-barred. Chase cites *Draiman*, 892 F. Supp. at 1098, for the proposition that an alleged violation of § 1643 occurs, for statute of limitations purposes, when

the credit card's account is first charged. *Draiman* is of limited persuasive value on this point,

however, because it involved only a single unauthorized charge. Here, Mary Borg's credit card

incurred charges between May 22, 2002, and May 27, 2003. Moreover, unlike § 1642, § 1643 does

not include any terms with temporal meaning to identify when a "violation" occurs for purposes of

applying the statute of limitations. *Compare* 15 U.S.C. § 1642 ("No card shall be issued . . . .") *with*

15 U.S.C. § 1643 (noting that except for $50 cap, "a cardholder incurs no liability from the

unauthorized use of a credit card"). Thus, the better reading of § 1643 is that a violation of the

statute occurs with each unauthorized usage of the credit card. Under this reading, plaintiffs' § 1643

claim is time-barred, as the last unauthorized use of the card occurred on May 27, 2003, more than

one year from the date, June 24, 2004, on which Borg's complaint was filed. The district court's

entry of summary judgment in favor of Chase on plaintiffs' TILA claims is affirmed.

B.

Next, plaintiffs argue that the district court erred in granting summary judgment to Chase on

their negligence claim. Specifically, plaintiffs contend that the district court abused its discretion

in excluding their expert witness. The district court ruled as follows:

> Plaintiffs' complaint alleges that Chase was negligent in four ways: (1) failing to
> alert Mary Borg that it was sending an unsolicited credit card application; (2) failing
> to determine Mary Borg's age, health, or living arrangements, whether she regularly
> receives her correspondence, is capable of handling her own financial affairs, desires
> a credit card, or "is ambulatory"; (3) failing to monitor the "account of its patrons to
> determine if any unusual patterns of conduct exist"; and (4) accepting checks that do
> not bear the proper signature of the maker. Plaintiffs have produced no evidence that
> by failing to perform these acts, Chase's conduct fell below the required standard of
> care in the credit card industry. In their response to Chase's motion for summary
> judgment, however, Plaintiffs attach the affidavit of Don Coker, an expert in the

banking and credit card industries, who states that in his opinion, "the conduct of Chase in the solicitation of the Borg account, the verification of the signature, the monitoring of the account or lack thereof falls well below the standard of commercial reasonableness in the credit card industry in the United States.

Plaintiffs acknowledge that the disclosure of this expert is untimely, but assert that they were only recently able to afford to retain an expert, and they "pray the indulgence of the Court to be permitted to produce this expert proof."

. . .

The Court will not permit Plaintiffs to rely on expert testimony only disclosed six months after the expert disclosure deadline passed in an effort to defeat summary judgment. Chase has not had an opportunity to depose this expert, and therefore, would be prejudiced by the late disclosure of his statements submitted in opposition to its motion for summary judgment. Accordingly, the Court will not consider the opinion of Mr. Coker as to whether Chase's conduct fell below industry standards. As Plaintiffs have not come forward with any other evidence to create a triable issue of material fact on whether Chase breached its duty of care to Plaintiffs, the Court GRANTS Chase's motion for summary judgment on this cause of action.

On appeal, plaintiffs have not pointed to any other evidence in the record to support their contention that Chase's conduct fell below the industry standard. Thus, assuming, without deciding, that the Coker affidavit would have been sufficient to defeat Chase's motion for summary judgment on plaintiffs' negligence claim, the question before the court is whether the district court abused its discretion in excluding Borg's proffered expert witness. We conclude that it did not.

FED. R. CIV. P. 37(c)(1) provides:

A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1), or to amend a prior response to discovery as required by Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed.

Plaintiffs, as the sanctioned party, bear the burden of proving that their noncompliance with the rules and scheduling order was harmless. *Roberts v. Galen of Va., Inc.*, 325 F.3d 776, 782 (6th Cir. 2003). They contend that their failure to timely disclose Coker was substantially justified by their inability to afford expert assistance, and that their untimely disclosure was harmless because "there would be no delay in trial" and because "[a]t no point in time did any of the Appellees make any attempt to depose this expert witness." Plaintiffs' arguments are not well-taken.

First, plaintiffs' untimely disclosure was not substantially justified. Counsel for both parties agreed on the deadlines set forth in the Rule 16(b) scheduling order. If plaintiffs intended to hire an expert witness to support their negligence claim but were unable to do so before the expert disclosure deadline expired, they could have sought an extension of the deadline from the district court. Plaintiffs did not do so. In similar circumstances, we have held that exclusion is proper. *See Vaughn v. City of Lebanon*, 18 F. App'x 252, 264 (6th Cir. 2001) (unpublished) (noting that appellant "never provided any expert reports or other information regarding experts at any time prior to the response" to appellee's motion for summary judgment); *Bowe v. CONRAIL*, No. 99-4091, 2000 U.S. App. LEXIS 24866, at *9-10 (6th Cir. Sept. 19, 2000) (unpublished) (noting that appellant "made no efforts to ask for an extension of the deadline").

Moreover, plaintiffs' untimely disclosure was not harmless. We have explained previously that the advisory committee note to Rule 37 "strongly suggests that 'harmless' involves an honest mistake on the part of a party coupled with sufficient knowledge on the part of the other party." *Vance v. United States*, No. 98-5488, 1999 U.S. App. LEXIS 14943, at *16-17 (6th Cir. June 25,

1999) (unpublished); *see also Roberts*, 325 F.3d at 783 (citing *Vance* for this proposition). Plaintiffs have not explained why they failed to seek an extension of the expert disclosure deadline from the district court, and there is no suggestion that Chase was aware of plaintiffs' intent to supply expert testimony, or of Coker's identity, before plaintiffs filed a response to Chase's motion for summary judgment.

Thus, we hold that the district court did not abuse its discretion in excluding Coker's affidavit from plaintiffs' response to Chase's motion for summary judgment. Because plaintiffs have not identified any other evidence to support their argument that Chase's conduct fell below industry standards, the district court's entry of summary judgment in favor of Chase on this cause of action was proper. *See Yelder v. Credit Bureau of Montgomery, LLC,* 131 F. Supp. 2d 1275, 1286 (M.D. Ala. 2001) (holding that plaintiff must produce expert testimony to establish the commercial reasonableness of credit card company's conduct).

C.

Plaintiffs next contend that the district court erred in holding that TENN. CODE ANN. § 47-3-420 prohibits their claim of conversion against Chase. Plaintiffs claim that the district court mistakenly concluded that Mary Borg was the "issuer" of the forged checks in construing § 47-3-420.

TENN. CODE ANN. § 47-3-420, based on the Uniform Commercial Code ("UCC"), provides that an "action for conversion of an instrument may not be brought by . . . the issuer or acceptor of the instrument . . . ." The Tennessee Code defines "issuer" as the "maker or drawer of an

instrument." TENN. CODE ANN. § 47-3-105(c). The Code defines "drawer" as "a person who signs

or is identified in a draft as a person ordering payment . . . ." TENN. CODE ANN. § 47-3-103(a)(3).

Because Mary Borg was the person identified on the forged checks as the person ordering payment,

the district court correctly reasoned that Mary Borg was the "issuer" of the forged checks and that

plaintiffs' claim for conversion was consequently barred by § 47-3-420.

Plaintiffs contend that the court erred in so concluding. Plaintiffs dispute the district court's

reliance on the commentary to § 47-3-420, which states: "There is no reason why a drawer should

have an action in conversion. The check represents an obligation of the drawer rather than property

of the drawer." Plaintiffs argue that the next sentence in the commentary contradicts the district

court's conclusion: "The drawer has an adequate remedy against the payor bank for recredit of the

drawer's account for unauthorized payment of the check." TENN. CODE ANN § 47-3-420 cmt. 1. It

is hard to discern how this statement supposedly supports their conversion claim against Chase, as

the statement merely provides that plaintiffs ordinarily would have a separate cause of action against

the payor of the check, who in this case is Union Planters.[6]

Moreover, as the district court noted accurately, its conclusion was in accord with other

courts that have considered the application of the UCC to claims of conversion by victims of check

forgery. *See, e.g., Ownbey Enters., Inc. v. Wachovia Bank, N.A.*, 457 F. Supp. 2d 1341, 1353 (N.D.

Ga. 2006); *Grand Rapids Auto Sales v. MBNA Am. Bank*, 227 F. Supp. 2d 721, 730 (W.D. Mich.

2002); *Mid-Continent Specialists, Inc. v. Capital Homes, L.C.*, 106 P.3d 483, 487 (Kan. 2005). *See*

---

[6]As discussed *infra*, Borg's claim of conversion is barred by TENN. CODE ANN § 47-4-406.

*also DBI Architects, P.C. v. Am. Express Travel-Related Servs. Co.*, 388 F.3d 886, 895 (D.C. Cir. 2004) (observing that D.C. CODE § 28:3-420(a) provides that "an action for conversion of an instrument may not be brought by . . . the issuer . . . of the instrument"); *Guardian Life Ins. Co. of Am. v. Weisman*, 223 F.3d 229, 238 (3d Cir. 2000) (noting that current UCC "expressly disavows that a conversion action is available to drawers"). Although these cases are of persuasive value only, they are consistent with the plain text of the UCC-based TENN. CODE ANN. § 47-3-420, and offer further support for the district court's conclusion. We therefore agree with the district court's well-reasoned analysis and affirm its grant of summary judgment in favor of Chase on this cause of action.

V.

Next, plaintiffs challenge the district court's entry of summary judgment in favor of Union Planters on their breach of contract and negligence claims. The district court ruled that these claims were barred by TENN. CODE ANN. § 47-4-406 because the Borgs failed to inform Union Planters of the unauthorized signature on the first forged check within thirty days of the date Union Planters mailed the May 2002 statement evidencing the first forged check. TENN. CODE ANN. § 47-4-406 provides in pertinent part:

> (c)    If a bank sends or makes available a statement of account . . . the customer must exercise reasonable promptness in examining the statement or the items to determine whether (i) any payment was not authorized because of an alteration of an item or an unauthorized signature purportedly made by or on behalf of the customer, or because the payment was made in an incorrect amount, or (ii) a deposit is missing or has been incorrectly credited. If, based on the statement or items provided, the customer should reasonably have discovered the unauthorized payment or missing or incorrectly credited deposit, the customer must promptly notify the bank of the relevant facts.

(d)     If the bank proves that the customer failed, with respect to an item or deposit, to comply with the duties imposed on the customer by subsection (c), the customer is precluded from asserting against the bank:

(1)     Such payment or missing or incorrectly credited deposit, if the bank also proves that it suffered a loss by reason of the failure; and

(2)     the customer's unauthorized signature or alteration by the same wrongdoer on any other item paid in good faith by the bank if the payment was made before the bank received notice from the customer of the unauthorized signature or alteration and after the customer had been afforded a reasonable period of time, not exceeding thirty (30) days, in which to examine the item or statement of account and notify the bank.

The district court rejected plaintiffs' argument that § 47-4-406 was inapplicable because the account statements had been intercepted by Davis and, hence, the Borgs were denied the opportunity to discover the fraud.  Rather, the court – quoting the Tennessee Supreme Court's decision in *Vending Chattanooga, Inc. v. Am. Nat'l Bank & Trust Co.*, 730 S.W.2d 624, 626 (Tenn. 1987) – held that § 47-4-406 applied because Union Planters had satisfied their obligation under § 47-4-406 to "send or make available" the account statements to plaintiffs and that plaintiffs "must be held chargeable with knowledge of all the facts that a reasonable and prudent examination of the returned bank statements would have disclosed had it been made by a person on the depositor's behalf who had not participated in the forgeries."

The district court properly granted Union Planters summary judgment on plaintiffs' breach of contract and negligence claims.  First, despite plaintiffs' argument to the contrary, *see* discussion *supra*, there is no genuine issue of material fact as to whether Union Planters mailed out the joint checking account statements to the Borg residence.  Once Union Planters satisfied this requirement,

§ 47-4-406(c) requires bank customers to "exercise reasonable promptness" in reviewing their account statements to detect any unauthorized checks. TENN. CODE ANN. § 47-4-406(c). On appeal, plaintiffs have not argued that either James or Mary Borg exercised reasonable promptness in reviewing the account statements for the thirteen-month duration of Davis's check-forging scheme. In failing to notify Union Planters until May 2003 that Mary Borg had stopped receiving account statements, despite the fact that she had previously received them at the same time each month, plaintiffs did not exhibit the reasonable promptness required by § 47-4-406(c).

Nevertheless, plaintiffs argue on appeal that "the Plaintiffs promptly informed Union Planters upon learning of the forgeries on May 27, 2003" and that Union Planters "should have at a minimum been liable for any forged checks contained in bank statements from that date." Plaintiffs' argument overlooks the Tennessee Supreme Court's interpretation of TENN. CODE ANN. § 47-4-406 in *Vending Chattanooga*, when it held that a plaintiff's failure to exercise reasonable promptness in reviewing a bank statement precluded any claims asserted against the bank stemming from forged checks by the same forger revealed in future account statements. *See Vending Chattanooga*, 730 S.W.2d at 628 ("[P]laintiff customer [is] precluded from asserting against the bank those forged checks received and paid by the bank within a reasonable time . . . after the bank had sent the *first* monthly statement to the customer with any forgeries.") (emphasis added); *id.* at 629-30 (holding that plaintiff's failure to exercise reasonable care under § 47-4-406 "was a proximate cause of payment by the bank of forged checks after the two checks paid in December 1982. The other thirty-eight checks were all paid by the bank over fourteen days after the customer was sent the December 1982 statement and

cancelled checks containing the first two forgeries."). Because the Borgs "failed . . . to comply with the duties imposed on the customer by [TENN. CODE ANN. § 47-4-406(c)]" they are precluded from asserting against Union Planters any claims for payment on an unauthorized check concerning forgeries performed by Davis.[7]

## VI.

Finally, plaintiffs challenge the district court's grant of summary judgment in favor of Home Instead on plaintiffs' claims of vicarious liability, negligent hiring, and negligent supervision. Plaintiffs contend that the district court erred in ruling that Davis's fraud and forgeries were not committed within the scope of her employment, pointing out that Davis would answer the phone and retrieve the mail while working at the Borg residence.

"The doctrine of respondeat superior renders employers vicariously liable for the torts their employees commit while acting within the scope of their employment." *Tenn. Farmers Mut. Ins. Co. v. Am. Mut. Liability Ins. Co.*, 840 S.W.2d 933, 937 (Tenn. Ct. App. 1992). "In order to hold an employer liable, the plaintiff must prove (1) that the person who caused the injury was an employee, (2) that the employee was on the employer's business, and (3) that the employee was acting within the scope of his employment when the injury occurred." *Id.* (citing *Hamrick v. Spring City Motor Co.*, 708 S.W.2d 383, 386 (Tenn. 1986)); *Midwest Dairy Prods. Co. v. Esso Standard*

---

[7]The district court also held that plaintiffs' claim with respect to a forged check dated April 18, 2002, is barred by TENN. CODE ANN. § 47-4-406(f)'s one-year notice prerequisite. Because plaintiffs do not challenge this aspect of the district court's order, and because § 47-4-406(d) precludes plaintiffs' claims against Union Planters with respect to all of the forged checks, § 47-4-406(f)'s one-year notice prerequisite applicability is not before this court.

*Oil Co.*, 246 S.W.2d 974, 975 (Tenn. 1952). Whether an employee is acting within the scope of her employment is a question of law. *Id.*

Tennessee courts consider the following factors, provided by the Restatement (Second) of Agency § 228 (1957), to determine whether an employee's acts fall within the scope of her employment:

> (1)    Conduct of a servant is within the scope of employment if, but only if:
>
> (a)    it is of the kind he is employed to perform;
>
> (b)    it occurs substantially within the authorized time and space limits;
>
> (c)    it is actuated, at least in part, by a purpose to serve the master; and
>
> (d)    if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.
>
> (2)    Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time and space limits, or too little actuated by a purpose to serve the master.

*Id.* at 938. Considering these factors, the district court ruled correctly that Davis was acting outside the scope of her employment when she applied for a credit card under Mary Borg's name, used the credit card to withdraw thousands of dollars from Memphis-area ATMs, and forged checks under Mary Borg's name to pay for the credit card bills. Even assuming Davis's conduct satisfies the first two elements, there is no evidence in the record to suggest that Davis's fraud and forgery was motivated in any part to serve Home Instead. Moreover, the uncontroverted evidence set forth in Doane's affidavit provides that Home Instead performed numerous background checks on Davis before hiring her and was not informed of her fraudulent activities until the Borg's called Home

Instead and explained why they did not want Davis to return to the Borg residence. Because plaintiffs cannot satisfy either of the last two factors, the district court properly granted Home Instead's motion for summary judgment on plaintiffs' claim of vicarious liability.

In their brief on appeal, plaintiffs also indicate that they are challenging the district court's grant of summary judgment on their negligent hiring claim. In the section of their brief devoted to claims against Home Instead, however, they do not discuss this claim, focusing their argument on their vicarious liability claim. Plaintiffs have therefore waived their appeal with respect to the negligent hiring claim. *Indeck Energy Servs. v. Consumers Energy Co.*, 250 F.3d 972, 979 (6th Cir. 2000) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."); *Adams v. Philip Morris, Inc.*, 67 F.3d 580, 583 (6th Cir. 1995) ("We ordinarily consider issues not fully developed and argued to be waived."). Moreover, as plaintiffs conceded at oral argument, there is no evidence in the record to suggest that Davis had a criminal record before accepting employment with Home Instead. Even if Home Instead had performed a more expansive criminal background search, the record discloses no reason to believe that it would have uncovered any information that should have dissuaded it from hiring Davis. Thus, plaintiffs cannot establish causation with respect to their negligent hiring claim, and the district court correctly granted summary judgment on this claim in favor of Home Instead.

VII.

The district court's July 21, 2006, order granting defendants' motions for summary judgment is affirmed.